```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE MIDDLE DISTRICT OF ALABAMA

 3                            SOUTHERN DIVISION

 4

 5      UNITED STATES OF AMERICA

 6           vs.                  CASE NO.: 1:06-cr-171-MEF

 7      HUGH EDWARD BLACK,

 8                  Defendant.

 9             * * * * * * * * * * * * * *

10                            SENTENCING

11             * * * * * * * * * * * * * *

12           BEFORE THE HONORABLE UNITED STATES DISTRICT JUDGE MARK

13    E. FULLER, at Montgomery, Alabama, on Thursday, April 3, 2008,

14    commencing at 9:05 a.m.

15                            APPEARANCES

16    FOR THE GOVERNMENT:      Ms. Susan R. Redmond
                               Assistant United States Attorney
17                             OFFICE OF THE UNITED STATES ATTORNEY
                               131 Clayton Street
18                             Montgomery, Alabama  36104

19    FOR THE DEFENDANT:       Mr. Michael J. Petersen
                               FEDERAL DEFENDERS
20                             MIDDLE DISTRICT OF ALABAMA
                               201 Monroe Street, Suite 407
21                             Montgomery, Alabama  36104

22

                  Proceedings reported stenographically;
23
                    transcript produced by computer
24

25
```

1              (The following proceedings were heard before the

2    Honorable United States District Judge Mark E. Fuller, at

3    Montgomery, Alabama, on Thursday, April 3, 2008, commencing at

4    9:05 a.m.)

5              THE COURT:  Good morning, counsel.  We have five

6    sentencings set this morning.  I don't expect us to be here more

7    than a couple of hours unless something occurs unexpectedly in a

8    case.

9              We will start off in the case of United States of

10   America versus Mr. Black.  I think you wanted to go first,

11   Mr. Petersen?  You have a witness, I believe, is what I've been

12   told?

13             MR. PETERSEN:  Yes, Your Honor, I do, and I appreciate

14   the Court's indulgence in allowing me to go first.

15             THE COURT:  I'll call the case of United States of

16   America versus Hugh Edward Black, case number 06-cr-171, in the

17   United States District Court for the Middle District of Alabama,

18   Southern Division.  Is the United States prepared to go

19   forward?

20             MS. REDMOND:  Yes, Your Honor.  Good morning.

21             THE COURT:  Good morning, Ms. Redmond.

22             Is the defense prepared to go forward?

23             MR. PETERSEN:  Yes, Your Honor.  Good morning.

24             THE COURT:  Mr. Black, today the Court will determine a

25   reasonable sentence in your case by considering the United

1    States Sentencing Guidelines, which were promulgated pursuant to

2    the Sentencing Reform Act of 1984, and which are now advisory,

3    and by also considering the factors set forth in 18 United

4    States Code Section 3553(a).

5         It appears that there has been a plea agreement that

6    has been reached by you and the United States in this case

7    pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal

8    Procedure, which I commonly refer to as a binding plea

9    agreement.  There are certain obligations that I have to you,

10   Mr. Black, to inform you of the Court's intentions to either

11   follow the plea agreement, and therefore accept your plea of

12   guilty, or to reject the plea agreement and to give you an

13   opportunity to withdraw your plea of guilty and to proceed to

14   trial.  Are you prepared to go forward this morning?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  If I could have counsel state the terms of

17   the plea agreement at this time for the Court.

18        MS. REDMOND:  Your Honor, the terms of the 11(c)(1)(C)

19   plea agreement between the parties are as follows:  That the

20   defendant would enter a plea of guilty to counts one and two of

21   the indictment and agree to pay restitution in the amount of

22   $32,000 -- excuse me -- $32,283 to the United States of America

23   or to the person who was at the time the minor daughter.  I

24   would ask that I not be required to give her name at this time.

25        THE COURT:  That would be agreed.

1          MS. REDMOND:  Thank you, Your Honor.

2          He agreed to waive appeal and collateral attack.  The

3    government agreed that if the defendant met those terms and

4    continued to accept responsibility and to not obstruct justice

5    that a two-level reduction in the offense level as determined by

6    this Court would be acceptable, and that should the government

7    determine that he qualified for an additional reduction for

8    acceptance of responsibility of one point, the government would

9    make that motion.  We agree additionally, Your Honor, to

10   recommend a sentence at the bottom of the advisory sentencing

11   guidelines as determined by this Court at sentencing.  We agree

12   that that would be an appropriate disposition of the case.

13          THE COURT:  Now, I understand, Mr. Black, that you were

14   scheduled for sentencing in December of 2007, and to cut to the

15   chase, so to speak, you failed to show up for that sentencing

16   and were subsequently arrested, and you've been in custody since

17   December of 2007; is that correct?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Is it the government's intention that there

20   would be the third point request for the acceptance of

21   responsibility applicable to Mr. Black?

22          MS. REDMOND:  No, sir.

23          THE COURT:  Are you asking that either -- well, I can't

24   apply one point.  Are you asking the Court to then disregard the

25   two points for acceptance of responsibility because of

1    Mr. Black's conduct since his indictment and plea?

2            MS. REDMOND:  It is the government's position that his

3    failure to appear is, in fact, an obstruction of justice in this

4    matter, and we would ask that the Court not, in fact, apply the

5    additional two levels for acceptance.

6            THE COURT:  What is your response, if any,

7    Mr. Petersen?

8            MR. PETERSEN:  Your Honor, I would ask the Court to --

9    I have an expert witness here to testify to the Court, and I

10   believe after the Court hears testimony from this witness, I

11   believe that would explain at least in some part under

12   3553(a)(1) as to why Mr. Black failed to show at his original

13   sentencing hearing and was not present.

14           THE COURT:  If you and Mr. Black would take a seat, and

15   you may call your first witness.

16           MR. PETERSEN:  Defense calls Dr. David Ghostley.

17              (Witness sworn)

18         DAVID GHOSTLEY, the witness, having been duly sworn,

19   testified as follows:

20                          DIRECT EXAMINATION

21   BY MR. PETERSEN:

22   Q.  Would you please state your name for the record and spell

23   your last name, please.

24   A.  David Ghostley.  G-H-O-S-T-L-E-Y.

25   Q.  Are you a doctor?

1    A.   Yes.   I'm a licensed psychologist with a doctorate in

2    clinical psychology.

3    Q.   Where did you get your degrees?

4    A.   I got my degree at Argosy University, Georgia School of

5    Professional Psychology, in Atlanta, Georgia, and I studied at

6    Emory University for two years at the school of medicine and at

7    the Emory Center for Rehabilitation Medicine.   I did a year at a

8    community mental health center -- clinic in McDonough, Georgia.

9    I did an internship at Florida State Hospital, and then I did a

10   year at Florida State Hospital after that.   So I've got about

11   six years of supervised experience, and I've been in independent

12   practice now for five years.   I have a specialty in forensic

13   psychology, and I'm certified by the state of Alabama in that

14   capacity.

15          MR. PETERSEN:   Your Honor, I do not intend to offer

16   Dr. Ghostley as an expert witness, but as a witness in

17   mitigation.   If the Court would be satisfied with the background

18   that I've thus far laid, I will proceed with questions that I

19   have for this witness.

20          THE COURT:   I don't make it a practice to certify

21   witnesses as being expert in any particular field.   All I do is

22   say whether you can elicit expert opinions from them.   And

23   subject to any objection by Ms. Redmond, I will allow you to ask

24   this witness any opinions that he will be able to render to the

25   Court based on his qualifications.

1          MS. REDMOND:  No objections.

2          MR. PETERSEN:  Thank you, Your Honor.

3   Q.  Dr. Ghostley, did you examine Mr. Hugh Black?

4   A.  Yes, I did.

5   Q.  About what day and time was that?

6   A.  That was on March 11th, 2008.

7   Q.  And where did you conduct your examination?

8   A.  At the Autauga County Jail.

9   Q.  What methods did you use to conduct that examination?

10  A.  I examined him by way of clinical interview and also

11  administered testing; however, the testing was not completed.

12  Q.  What was your impression of Mr. Black's mental status when

13  he presented himself for your clinical interview?

14  A.  Well, when I saw him, I immediately noted that he was

15  hypervigilant and has a rather exaggerated stark response.

16  Whenever noises such as the bar doors or the heavy doors were

17  closing around the room that we were in, he was always kind of

18  jumpy and, you know, looking to see what was going on.  He was

19  depressed, often tearful, anxious.  He was complaining of

20  flashbacks related to posttraumatic stress disorder that was

21  diagnosed by the Veterans Administration in the early nineties

22  as related to two tours in Vietnam.

23  Q.  Dr. Ghostley, would you explain briefly to the Court what

24  posttraumatic stress disorder is.

25  A.  Posttraumatic stress disorder is a reaction to trauma

1  experienced by the individual.  Oftentimes you see it with

2  veterans, victims of rape, victims of assaults.  And

3  posttraumatic stress disorder falls under the umbrella of

4  anxiety disorders.  Oftentimes these people are irritable, have

5  mood swings, they are hypervigilant, highly anxious, often

6  depressed.  They experience possible flashbacks of the trauma,

7  nightmares of the trauma, intrusive thoughts of the trauma.

8  They're often hypervigilant.  Interpersonal sphere is impaired;

9  in other words, they don't get along well with people.  They

10  have trouble with intimacy.  They tend to prefer to be alone

11  oftentimes and isolate -- isolate themselves from others.

12  Q.  What would be the impact of a very stressful situation on an

13  individual with PTSD?

14  A.  PTSD -- persons with PTSD often react in one of two ways.

15  One, they'll either go full force with an exaggerated type

16  response, become very confrontive, or they will avoid stress and

17  simply walk away from it or avoid it.

18  Q.  In your opinion, did Mr. Black exhibit during your interview

19  of him symptoms of PTSD?

20  A.  He exhibited the common signs of PTSD:  Hypervigilance,

21  anxiety.  I could see that he was depressed and sad.  He also

22  reported symptoms.  He found the jail environment to be

23  exceedingly stressful.  He was no longer on any psychotropic

24  medication to mediate his symptoms, and he was reporting

25  increased incidence of flashbacks; high level of anxiety.  He,

 1  of course, exhibited the hypervigilance, and he was very

 2  depressed.

 3  Q.  Would an individual with PTSD, when facing a stressful

 4  situation, be just likely to disappear, walk away from that

 5  situation?

 6  A.  I'd say that would be a likely or a very highly possible.

 7  Like I say, it can be one of two things.  But, you know, if he

 8  found it overwhelming, yes, he would be likely to do that; in

 9  fact, under very high stress levels, persons with PTSD at times

10  dissociate and -- meaning their mind goes somewhere else.

11      You may have read about rape victims that have been raped

12  multiple times.  They learn to go someplace else in their head

13  during the trauma, and then after the rape has ended, they have

14  little memory of the rape because they dissociated during the

15  traumatic experience.

16  Q.  And would you -- in your opinion, would this PTSD be one

17  reason for Mr. Black having not appeared at his original

18  sentencing date?

19  A.  I think it's likely that it was.  He has a longstanding

20  pattern of avoidance, stress avoidance.  He has been in

21  several -- I believe three failed marriages.  He's been through

22  probably at least 50 different jobs.  He doesn't get along well

23  with his employers, and rather than fight, he just walks away.

24  So I think this longstanding pattern he has is, you know,

25  related to him not showing up here for his sentencing hearing.

1   Q.  Thank you.

2           MR. PETERSEN:  Your Honor, I have nothing further for

3   this witness.  I'll tender him to the government.

4           THE COURT:  Ms. Redmond?

5                        CROSS-EXAMINATION

6   BY MS. REDMOND:

7   Q.  Is it Dr. Ghostley?

8   A.  Yes, ma'am.

9   Q.  Dr. Ghostley, what records did you review in this matter?

10  A.  I believe I only reviewed -- I didn't review any.  I just

11  reviewed -- I just examined the clinical interview and psych --

12  and attempted psychological testing.

13  Q.  All right.  So all the information you have about his 50

14  plus jobs and his PTSD and his service in Vietnam, et cetera,

15  was from his own mouth; is that correct?

16  A.  Yes, ma'am.

17  Q.  You haven't verified any of that?

18  A.  I have not.

19  Q.  You don't know anything about whether or not he's ever been

20  married, let alone had failed marriages?

21  A.  Only what he told me.

22  Q.  Are you aware of whether or not Mr. Black, prior to your

23  visit to him in the jail, whether or not he had ever spent time

24  in a jail situation before?

25  A.  I believe he told me he was convicted of criminal

1  trespassing in 1998.

2  Q.  And my specific question is do you know whether or not he

3  had ever spent time in a jail facility before?

4  A.  I don't know.

5  Q.  Would you expect that a person who is for the first time

6  incarcerated might experience some difficulty adjusting to that

7  situation?

8  A.  Absolutely.  And particularly with PTSD.

9  Q.  A person without PTSD or any mental difficulties, anxiety

10  disorders, social disorders, what have you, would you expect

11  that a, for lack of a better -- and please understand, I know

12  this is not the right term, but a "normal" person would have

13  trouble dealing with being incarcerated?

14  A.  Yes.  I've been a prison psychologist as well, and that's

15  true.

16  Q.  It's not unusual for somebody to be hypervigilant when they

17  are first placed in an experience like that.  Would you agree?

18  A.  I think they would have increased vigilance.  This was -- I

19  mean, this was -- what would I -- kind of -- this is a hallmark

20  of PTSD, and he exhibited the -- you know, the classic signs of

21  hypervigilance.

22  Q.  Did he know who you were?

23  A.  Yes.

24  Q.  He knew you were a doctor there to evaluate him?

25  A.  Yes, he did.

1  Q.  Do you know if he was warned of that fact prior to your

2  arrival?

3  A.  I believe he was.

4  Q.  So he knew that you were coming to see him to evaluate him

5  for the exact purpose for which you are here today; is that

6  correct?

7  A.  I believe he did, yes.

8  Q.  Is he an intelligent person?

9  A.  Yes, he is.

10 Q.  You indicated that you conducted a session with him for lack

11 of a better term; is that correct?

12 A.  Yes.

13 Q.  And you had given him some testing, but that testing was not

14 completed; is that correct?

15 A.  Correct.

16 Q.  Did you give him any tests for malingering?

17 A.  I did not.

18 Q.  So you are not able to tell us today whether or not he, in

19 appearing hypervigilant, depressed and tearful and explained to

20 you that he was having flashbacks, whether or not that might

21 have been signs of malingering?

22 A.  He could have been falsely reporting -- he could have been

23 falsely reporting flashbacks, but what I saw was depressed mood,

24 hypervigilance.

25 Q.  But he could have adjusted himself to present that to you,

1  knowing your purpose in viewing him today, even with your

2  experience.  I'm not in any way, shape, or form doubting your

3  experience, but he knew what you were there for that day; is

4  that correct?

5  A.  He did.

6  Q.  And you had never met him before; is that correct?

7  A.  That's true.

8  Q.  So you don't know what he's like on a day-to-day basis as

9  opposed to how he is in prison or jail?

10  A.  That's true.

11  Q.  Now, does his PTSD have anything to do with his ability to

12  lie and manipulate the system or people to get what he wants?

13  A.  No, I don't believe it does.

14  Q.  Sir, were you made aware of where Mr. Black was eventually

15  located after he absconded from supervision?

16  A.  Where they arrested him?

17  Q.  Yes, sir.

18  A.  Yes, I was.

19  Q.  Can you tell us where that was.

20  A.  I understand he was playing golf.

21  Q.  He was playing golf in a tournament; is that correct?

22  A.  I'm not aware of the -- if it was a tournament or not.

23  Q.  Do you know whether or not he had engaged in -- other than

24  the absconding from supervision, whether or not he had in any

25  way, shape or form failed to meet the other requirements of his

1    supervision such as not -- or failing to incur new debt?

2    A.  I never looked at it through that lens, but I know he moved

3    down to the southern part of Alabama, and I believe he got into

4    living in a small trailer or something like that that must have

5    cost some money.

6    Q.  The position that you've taken is that the PTSD itself is

7    key to why he failed to come to his sentencing at the time it

8    was previously scheduled?  Is that my understanding?

9    A.  I think it should be considered.

10   Q.  Thank you, sir.  Nothing further.

11            THE COURT:  Mr. Petersen?

12            MR. PETERSEN:  Very briefly, Your Honor.

13                     REDIRECT EXAMINATION

14   BY MR. PETERSEN:

15   Q.  Dr. Ghostley, do you believe, based on your experience both

16   as a prison clinical psychologist and your examination of

17   Mr. Black, that he was, for lack of a better term, faking it?

18   A.  I don't think he was faking it.  I'm also retired from the

19   United States Army, and I worked with a lot of Vietnam veterans

20   that have PTSD.  I've seen it and -- I've seen it in clinical

21   practice as well now with the troops returning from Iraq and

22   Afghanistan.

23   Q.  So it would be your opinion that he was not malingering or

24   trying to manipulate you into believing that he had PTSD?

25   A.  Right.  I don't think he would -- I don't think he was

1  malingering.

2  Q.  And his being arrested on a golf course or living somewhere

3  else, would that be typical of a person with PTSD?

4  A.  I think it would be typical of any soldier.  He was getting

5  cold up in the north part of Alabama, as far as I understand it,

6  and he moved to the south to stay warm.  He was also -- he also

7  reported that he was advised to engage in physical activity such

8  as golf by a psychologist who he was seeing at the VA.  I

9  believe it was a Dr. Whittaker.  And so he was trying to

10  comply.  This is -- physical activity is part of stress

11  reduction, and he found it to be helpful is what he told me.

12  Q.  In your practice would you advise physical activity as a

13  means of stress reduction?

14  A.  Yes.

15  Q.  I have nothing further, Your Honor.

16         MS. REDMOND:  One follow up, Your Honor.

17                  RECROSS-EXAMINATION

18  BY MS. REDMOND:

19  Q.  Did I understand you to say that he reported that he was

20  complying with a doctor's orders in playing golf?

21  A.  I believe he was complying with the suggestion made by a

22  psychologist.

23  Q.  He has no difficulty, then, in understanding and, if he so

24  chooses, implementing suggestions and/or orders?

25  A.  I would say that depending on the stress involved, he could

1    have trouble, because that's what posttraumatic stress disorder

2    is all about.  I mean, the golfing situation is nonstressful.

3    He goes out, he chooses to go play golf.  Under other situations

4    where there's stress, and he perceives it to be overwhelming

5    perhaps, he may have trouble making a decision like that.

6    Q.  It's your position, then, that failing to follow the orders

7    of his probation officer and the court put him in such a

8    stressful situation that he was unable to meet those

9    requirements or follow those orders?

10   A.  No, I wouldn't say unable.

11   Q.  Unwilling?

12   A.  Maybe -- let's see.  How could I say that?  I would say that

13   he followed a longstanding pattern or habit --

14   Q.  Of his own?

15   A.  -- that's related to PTSD of avoidance.  Avoidance and

16   anxiety are -- avoidance maintains anxiety.  When you don't

17   confront the anxiety-producing stimuli, the anxiety is

18   maintained.  You keep -- you know, you keep experiencing high

19   levels of stress, high-level anxiety, and so you -- the person

20   intuitively avoids the anxiety-producing situation, and that's

21   what maintains the anxiety.

22   Q.  And let me ask you this:  In avoiding the situation, this is

23   a situation that he caused; is that correct?

24   A.  It is a situation that he caused.

25   Q.  He creates the conflict and then walks away from it because

```
 1  he can't deal with the results of his own criminal activity?
 2  A.   This appears to be a common pattern in his life.
 3  Q.   According to his report to you?
 4  A.   Criminal and interpersonal -- yes, that's true.
 5  Q.   Thank you.  Nothing further.
 6            MR. PETERSEN:  Nothing further, Your Honor.
 7            THE COURT:  Any reason that Dr. Ghostley cannot be
 8  excused?
 9            MR. PETERSEN:  No, Your Honor.
10            MS. REDMOND:  No, Your Honor.
11            THE COURT:  Dr. Ghostley, you may step down.  You're
12  free to go.
13            THE WITNESS:  Thank you, Your Honor.
14            (Witness excused)
15            MR. PETERSEN:  Thank you, Your Honor.
16            THE COURT:  Mr. Petersen, for the record, what was the
17  purpose of your request for testimony from Dr. Ghostley?  Was it
18  in support of the terms of the plea agreement that Mr. Black
19  negotiated with the United States, which included reduction in
20  his criminal history category because -- I'm sorry -- his
21  offense level reduction because of his acceptance of
22  responsibility, or was it testimony elicited for the purposes of
23  a reasonable sentence under Section 3553(a)?
24            MR. PETERSEN:  Your Honor, it was for both purposes.
25  One, for the Court and the government's consideration as to a
```

1  reduction in the offense -- the total offense level, and also

2  for the Court's consideration under 3553(a)(1), the defendant's

3  characteristics and a reasonable sentence.

4       THE COURT:  As Dr. Ghostley's testimony would relate to

5  this Court's calculation of a reasonable sentence under the

6  United States Sentencing Guidelines, which I remind everyone is

7  advisory, and which, pursuant to the terms of the plea

8  agreement, include a reduction in Mr. Black's offense level for

9  his acceptance of responsibility and, conversely, an increase

10 for his -- an adjustment for obstruction of justice, the Court

11 would deny the request to apply a reduction in Mr. Black's

12 offense level for any acceptance of responsibility or would

13 reject any argument that the adjustment for obstruction of

14 justice should not be applied because of Mr. Black's conduct.

15      And for that reason, Mr. Black, it is my obligation to

16 inform you that I will not sentence you consistently with the

17 terms of the plea agreement that you have reached with the

18 United States pursuant to Rule 11(c)(1)(C), the binding plea

19 agreement.  And if you wish to go forward, you may do so; but at

20 this time, you have an opportunity to withdraw your plea of

21 guilty and to proceed to trial.

22      And I see Mr. Redmond standing up.

23      MS. REDMOND:  Judge, I disagree with the Court

24 respectfully.  He does not have the option of withdrawing.  The

25 11(c)(1)(C) was voided by his own action in this matter.

```
 1          THE COURT:  Out of an abundance of precaution,

 2  Mr. Black, you have this opportunity.  Do you wish to go forward

 3  or do you wish to withdraw your plea of guilty?

 4          MR. PETERSEN:  Your Honor, my client wishes to go

 5  forward.

 6          THE COURT:  Is that your wishes, Mr. Black?

 7          THE WITNESS:  Yes, sir.

 8          THE COURT:  Mr. Black, have you and your attorney had

 9  an opportunity to review the presentence report before today's

10  date?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Do you have any objection to any of the

13  content of the presentence report?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  Any objection, Mr. Petersen?

16          MR. PETERSEN:  No, Your Honor.  However, I would point

17  out that the probation officer is requesting a sentence of I

18  believe 21 months.  The guideline provision -- the advisory

19  guideline provision is 15 to 21 months.  I would ask the Court

20  to seriously consider, rather than the 21-month recommended

21  sentence, that Mr. Black, because of the testimony the Court has

22  just heard and under 18 USC 3553(a)(1), sentence him to the

23  15-month sentence called for by the guidelines.

24          THE COURT:  I'll consider that and give you an

25  opportunity to argue that at the appropriate time.  Any
```

 1   objections to the presentence report other than what you stated,

 2   Mr. Petersen?

 3           MR. PETERSEN:  No, Your Honor.

 4           THE COURT:  Any objections by the United States?

 5           MS. REDMOND:  No, Your Honor.

 6           THE COURT:  Without there being any objections to the

 7   content of the presentence report, the court adopts the factual

 8   statements contained in the presentence report, with specific

 9   findings under the guidelines that the offense level is 14 and

10   the criminal history category is I.  The guideline range is from

11   15 months to 21 months.  The supervised release period is from

12   two to three years, and the fine range is from $4,000 to

13   $40,000.

14           Mr. Petersen, do either you or your client have

15   anything to say at this time in further mitigation or otherwise

16   before the Court pronounces its sentence?

17           MR. PETERSEN:  Your Honor, I believe the Court has

18   heard testimony concerning the problems of PTSD.  I believe the

19   Court is well aware of Mr. Black's condition based upon

20   Dr. Ghostley's evaluation of him.  Even though Dr. Ghostley was

21   unable to review records, he is a very experienced clinical

22   psychologist and has met many people, as you heard, with PTSD,

23   and Mr. Black did exhibit those symptoms.  And I would ask the

24   Court to take that into consideration and sentence Mr. Black to

25   15 months rather than the recommended 21 months by probation.

```
1              THE COURT:  Mr. Black, the sentence will now be stated,
2    but you'll have a final chance to make any legal objections
3    before the sentence is imposed.  Based upon the advisory
4    guideline range and the applicable statutory factors, it is the
5    judgment of this Court that you, Hugh Edward Black, be committed
6    to the custody of the Federal Bureau of Prisons for a total
7    custodial term of 21 months.  Based upon your inability to pay,
8    the Court waives the imposition of a fine; however, you shall
9    pay to the United States District Court Clerk a special
10   assessment fee of $200, which is due immediately.
11             It is further ordered that you make restitution to the
12   United States District Court for the Middle District of Alabama
13   in the amount of $32,283, to be distributed to the victim whose
14   name will not be revealed in this court proceeding, but whose
15   name will be included in the judgment that the Court will impose
16   in this case.  Restitution is due immediately.  Any balance
17   remaining at the start of supervision shall be paid at a rate of
18   not less than $200 per month.  Based upon your financial status,
19   Mr. Black, the court waives the imposition of any interest.
20             Upon release from imprisonment, you shall be placed on
21   supervised release for a term of three years.  This term
22   consists of three years on each count, such terms to run
23   concurrently.  Within 72 hours of release from custody, you
24   shall report to the probation office in the district to which
25   you are released.  While you are on supervised release, you
```

 1   shall comply with the mandatory and standard conditions of

 2   supervised release on file with this Court.

 3        The Court also orders the following special

 4   conditions:  You shall participate in a program of drug testing

 5   administered by the United States Probation Office.  You shall

 6   provide the probation officer any requested financial

 7   information.  You shall not obtain new credit without the

 8   approval of the Court unless in compliance with the payment

 9   schedule.  You shall cooperate in the collection of DNA.

10        The Court finds that the sentence in this case is a

11   reasonable sentence and has been imposed to reflect the

12   seriousness of the offense, to promote respect for the law, and

13   to provide just punishment for the offense, to afford adequate

14   deterrence to criminal conduct, to protect the public from any

15   further crimes of you, Mr. Black, and to provide you with the

16   needed educational or vocational training, medical care, or

17   other correctional treatment in the most effective and efficient

18   manner available to this Court.  Lastly, the Court finds that

19   any lesser sentence would be insufficient to accomplish the

20   purposes set forth in 18 United States Code Section 3553(a)(2).

21   I will also order as an additional condition of your

22   incarceration that you be placed in a facility within the Bureau

23   of Prisons which can evaluate and treat you for any type of

24   mental or emotional stress or disorder that you suffer from,

25   Mr. Black, and that you continue that treatment as necessary as

1  part of your special conditions of supervision or supervised

2  release after you are released from the Bureau of Prisons.

3       Are there any objections to the sentence or the manner

4  in which this Court has pronounced it?  For example, Mr. Black,

5  do you have any objections to the Court's ultimate findings of

6  fact or conclusions of law to the extent that I've made any?

7       MR. PETERSEN:  Your Honor, we would object to the

8  Court's finding that 21 months is a reasonable sentence in this

9  case and under these circumstances pursuant to 18 United States

10  Code 3553(a.)

11      THE COURT:  Any objection by the United States?

12      MS. REDMOND:  No, Your Honor.

13      THE COURT:  Mr. Black, the sentence is ordered imposed

14  as stated, and I will now address your rights regarding appeal.

15  You have a right to appeal your sentence.  In order for your

16  appeal to be timely, you may need to file your notice of appeal

17  as soon as ten days after the Court enters its written judgment

18  in this case.  If you cannot afford the cost of an appeal, you

19  may petition this Court for leave to appeal in forma pauperis.

20  Pursuant to the plea agreement that you have reached with the

21  United States in this case, you have waived some if not all of

22  your rights regarding appeal.  Such waivers are generally

23  enforceable, but if you believe that your waiver is not

24  enforceable, I encourage you to present that theory to the

25  appropriate appellate court.  I'm not telling you to appeal or

1    not to appeal, Mr. Black.  That decision is yours.  I'm merely

2    informing you of your rights regarding appeal.  Do you

3    understand those rights?

4              THE DEFENDANT:  Yes, sir.

5              THE COURT:  Do you have any question about those

6    rights?

7              THE DEFENDANT:  No, sir.

8              MR. PETERSEN:  Your Honor, for the record, I would like

9    to ask the Court for a ruling as to whether the Court accepted

10   or rejected Mr. Black's plea agreement.  I was not absolutely

11   clear on that.

12             THE COURT:  I think I made it clear that I -- to the

13   extent that it called for the Court to mandatorily apply the

14   acceptance of responsibility as negotiated, I read the plea

15   agreement and I read the presentence report, and to the extent

16   that that is a part of his plea of guilty and it has not

17   otherwise been violated by his conduct, I rejected the plea

18   agreement.  But to the extent that his conduct caused the terms

19   of the plea agreement to be modified, then I am sentencing him

20   consistently with the plea agreement that he has negotiated.

21   But out of an abundance of precaution, I went over that with you

22   and your client, and I understood Mr. Black to have waived that

23   even if he chose to disagree with the Court's findings.

24             MR. PETERSEN:  Your Honor, that was my understanding.

25   I just wanted to be absolutely certain that I was understanding

```
 1   the Court correctly.

 2           THE COURT:  Okay.

 3           MR. PETERSEN:  I apologize.

 4           THE COURT:  No reason to apologize, Mr. Petersen.

 5           Is there anything else that we need to take up before

 6   we dismiss Mr. Black?

 7           MR. PETERSEN:  Nothing from Mr. Black, Your Honor.

 8           MS. REDMOND:  Nothing from the government.

 9           THE COURT:  Mr. Black, I do wish you the best of luck.

10   You are remanded to the custody of the United States Marshal.

11           (Proceedings concluded at 9:45 a.m.)

12                  * * * * * * * * * * * * * *

13                   COURT REPORTER'S CERTIFICATE

14           I certify that the foregoing is a correct transcript

15   from the record of the proceedings in the above-entitled matter.

16           This 22nd day of May, 2007.

17

18                           /s/ Patricia G. Starkie
                             Registered Diplomate Reporter
19                           Certified Realtime Reporter
                             Official Court Reporter
20

21

22

23

24

25
```